UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:15-cr-53 |
| ) | |
| GREGORY E. HERMAN, and ) | |
| FRANCIS M. PUTNEY ) | |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**
(Doc. 29)

This matter came before the court on November 18, 2015 for an evidentiary hearing on Defendant Gregory E. Herman's Motion to Suppress Physical Evidence and Statements (Doc. 29). Defendant argues that the traffic stop of the vehicle in which he was traveling was unreasonably prolonged beyond the time necessary to issue a warning or ticket for speeding. For this reason, he contends that his and the operator's consent to search the vehicle were tainted by that illegality and cannot provide the basis for a warrantless search of the vehicle's contents and the admission of his Co-Defendant Francis M. Putney's statements.

The government counters that the traffic stop was itself lawful and was not unreasonably prolonged. It argues that during the traffic stop, law enforcement developed a reasonable suspicion that the vehicle's occupants were engaged in criminal activity either through information known to the law enforcement officer who stopped the vehicle or through the collective knowledge doctrine.

In a one count Indictment, Defendant is charged with knowingly and intentionally possessing heroin with intent to distribute on April 15, 2015, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), 18 U.S.C. § 2. (Doc. 11.)

The government is represented by Assistant United States Attorneys Christina E. Nolan and Heather E. Ross. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

I.  **Findings of Fact.**

On April 15, 2015, the Vermont Drug Task Force ("VDTF") received information from a confidential informant ("CI") that an individual engaged in selling narcotics in the St. Johnsbury, Vermont area would be arriving at a White River Junction, Vermont bus station on a bus from New York.[1] The CI had previously participated in controlled buys for the VDTF and had provided accurate information regarding the target of an investigation. The CI described the suspected drug courier as a tall, slender black male who walked with a distinct limp and whose alias was "Murder." At the time, the VDTF was focusing its investigative resources on public mass transportation in Vermont after having seized approximately 14,000 to 15,000 bags of heroin; 200 grams of cocaine base; 200 grams of cocaine powder; and an undetermined number of prescription pills from individuals arriving by bus or train to destinations in Vermont.

As a result of the CI's tip, the VDTF conducted surveillance of the bus station on the date and time of the suspected drug courier's anticipated arrival. Vermont State Police ("VSP") Detective Sergeant Karl Gardner oversaw the surveillance team which was comprised of VDTF members who were undercover and dressed in plain clothes and uniformed police officers in the area who could pursue a suspect in a marked police cruiser. The surveillance team surrounded the bus station and prepared to videotape the arrival of passengers from the bus from New York.

At approximately 1:00 p.m., a Greyhound bus arrived from New York and a tall, slender black male with a discernible limp, later identified as Defendant, disembarked carrying a small bag.[2] Defendant went into a gasoline station and then proceeded to a black Toyota pickup truck where he got into the front passenger seat while a white male got into the operator's seat.

By checking the license plate number, the VDTF determined that the black Toyota pickup truck was registered to Robert Putney. This name had immediate significance to

---

[1] This appears to be a reference to New York City.

[2] Detective Sergeant Gardner subsequently determined that Defendant was not the individual about whom the VDTF had received the confidential tip.

2

Detective Sergeant Gardner for several reasons. He was aware that VSP was investigating whether Robert and Francis Putney were heroin users who sold heroin out of the "Putney Garage"—a mechanic's garage which they owned with their father and which was located next to their residence in Graniteville, Vermont. Detective Sergeant Gardner was also aware that in the winter of 2015, VSP had conducted a "saturation patrol," stopping individuals going to and from the Putney Garage for investigative purposes. In furtherance of this effort, VSP had developed a "spider web" depicting the Putney Garage and Robert and Francis Putney as the "targets" in the center of the web, and indicating the vehicles and individuals associated with them.

In addition to VSP's investigation of the Putneys, a December 3, 2014 email from VSP Detective Sergeant Daniel Trudeau to Detective Sergeant Gardner provided the following information:

> From: "Trudeau, Daniel"
> Date: December 3, 2014 at 11:25:27 AM EST
> To: "Cochran, Wade" "Gardner, Karl"
> Subject: Putney Garage in Granit[e]ville
>
> (Wade [Cochran], I just spoke to Karl [Gardner] about this a few minutes ago, but here is some dope tip)
>
> Earlier this morning dispatch patched me through to a DMV Inspector ([name and phone number provided]). He said that they had received a tip from some guy [name and address provided] that there was drug activity at the Putney Garage on Cogswell Road in Graniteville. The tip was specifically in reference to heroin, though I wasn't exactly clear if the guys in the garage were just users or users/sellers. They are brothers I believe . . . Francis and Robert Putney. DMV just wanted to pass along the info to us in case we were actively looking at them or wanted to. The garage is a State Inspection location. They advised there is obviously not much they can do other than randomly go in and observe that these guys can do State Inspections the appropriate way. I told them I would pass it along to you guys and you can do from there if there is anything. [The DMV inspector] said that they did not have a current number for the complainant but that his email address is [email address provided.]
>
> If you need any more info, [DMV inspector] said to give him a call. I did not put this into CrimeNtel. That's about all I got.

Gov't Ex. 8.

Detective Sergeant Gardner was further aware that VSP Trooper Wade Cochran, who was part of the VDTF surveillance team, had recently encountered a male at the VSP Middlesex Barracks who turned over a purse containing heroin. This male reported that the heroin belonged to his ex-girlfriend, came from a vehicle owned by Francis Putney who was his ex-girlfriend's "source of supply," and stated that the Putneys were "tripping down south" to obtain heroin. He also knew that on February 16, 2015, VSP had conducted a traffic stop of three people en route to the Putney Garage. One of the vehicle's occupants was a known drug user. A search of the vehicle uncovered a handgun, a prescription bottle, and a small amount of marijuana. The vehicle was towed from the scene by the Putney Garage after it was determined that the operator lacked the required insurance. Finally, Detective Sergeant Gardner had knowledge of an investigation by Special Agent Scott Murray of the Bureau of Alcohol, Tobacco and Firearms into whether Robert Putney was engaged in straw purchases of firearms for the purpose of trading firearms for drugs. Special Agent Murray advised that he believed that there was an out-of-state source of heroin to which the firearms were delivered.

Using an encrypted radio channel, Detective Sergeant Gardner informed the VDTF surveillance team that an unknown person had been picked up by a male in a black Toyota pickup truck registered to a Putney at a known location for drug couriers. He directed the team members to stop the vehicle if there was a lawful reason to do so and reported the plate number for the pickup truck as "BDX335." Detective Sergeant Gardner was in a vehicle following the pickup truck, and determined that it was traveling 80 to 86 miles per hour in an area of Interstate 89 with a posted speed of 65 miles per hour. He radioed this information to the team as well.

Approximately one mile from the bus station, VSP Trooper Richard Slusser was in a marked VSP cruiser with his canine, standing by to support the VDTF surveillance team. Trooper Slusser is an experienced trooper, who has performed "thousands of car stops[.]" (Doc. 29-1 at 2.) He ran the pickup truck's plate number and determined that it was registered to Robert and Amber Putney of Graniteville, Vermont. He queried VSP's intelligence program to determine if the vehicle had previous contact with law

4

enforcement and discovered that the vehicle was stopped on January 22, 2015 for lack of an inspection sticker. Trooper Slusser radioed this information to the VDTF surveillance team and headed north on Interstate 89 in the direction of Graniteville.

Trooper Slusser also found Robert Putney's name immediately significant because he knew the Putneys were suspected of drug trafficking from their Graniteville garage. The government introduced into evidence a recording of a March 10, 2015 telephone conversation between Trooper Slusser and his supervisor, VSP Detective Sergeant Eric Albright, in which his supervisor advised that Robert Putney "was running heroin and selling it out of his old man's body shop up there in Graniteville," that his father owned the shop from which they sold used cars, and that he was "going to the city and slinging dope out of the shop." Gov't Ex. 6.[3]

After approximately fifteen minutes, Trooper Slusser located the black pickup truck with the identified plate number travelling north on Interstate 89 near Royalton, Vermont. Using both radar and a visual estimation of its speed, he determined that the pickup truck was traveling at approximately 77 miles per hour in an area with a posted speed limit of 65 miles per hour. Because this was a violation of Vermont law,[4] he effected a traffic stop at approximately 1:20 p.m. In doing so, he noticed that the pickup truck took longer than usual to pull off to the side of the road and he memorialized this observation in the video recording of the stop.[5]

At the scene of the traffic stop, Trooper Slusser exited his cruiser, approached the pickup truck, and identified himself. He asked the operator, who later identified himself as Francis Putney, for his operator's license. At that point, VSP Trooper Tim Gould, who was also part of the VDTF surveillance team, arrived on the scene.

---

[3] Neither Trooper Slusser's report of the April 15, 2015 traffic stop, nor his affidavit in support of probable cause documented his prior knowledge of the Putneys' alleged drug trafficking.

[4] See 23 V.S.A. § 1003 (authorizing the Traffic Committee to determine the "maximum speed limit"); see also 22-4 Vt. Code R. § 2:I (2015) (providing that "[t]he maximum speed limit at which any motor vehicle may be operated on limited access highways shall be sixty-five (65) miles per hour").

[5] The traffic stop is depicted on two cruiser video recordings which were introduced into evidence as Government's Exhibits 4 & 5.

Mr. Putney produced his registration, but stated that he did not have his operator's license with him although he knew the number. He also advised that he did not have any other identification. Trooper Slusser detected signs of "extreme nervousness" in Mr. Putney because his hand trembled excessively and his heart was visibly beating hard and fast beneath his shirt. Trooper Slusser told Mr. Putney that he needed to verify his identity and asked whether he would consent to exiting the pickup truck for a couple of minutes. Mr. Putney responded in the affirmative and exited his vehicle. Trooper Gould subsequently approached the passenger side of the pickup truck and engaged in conversation with Defendant.

While they stood outside his police cruiser, Trooper Slusser told Mr. Putney that he was going to "run his information" and that if he entered the police cruiser, he would need to search his person, but that he could decide not to allow this search. After obtaining Mr. Putney's consent, Trooper Slusser conducted a brief "pat down" of his person which revealed no weapons or contraband. In the course of conducting the pat down, Trooper Slusser asked Mr. Putney where he was coming from. Mr. Putney advised that he was coming from West Lebanon, which is in New Hampshire.

Thereafter, Trooper Slusser and Mr. Putney entered Trooper Slusser's cruiser. Mr. Putney sat in the front passenger seat without handcuffs or other restraints and Trooper Slusser sat in the driver's seat. Trooper Slusser began the process of writing Mr. Putney a warning for excessive speed. Mr. Putney confirmed his identity by providing his name, date of birth, and his license number.[6] When Trooper Slusser asked where his operator's license was, Mr. Putney responded that he drives a tow truck and leaves his license in the truck. He noted that he also did not have a wallet. When asked how he knew Defendant and where he had picked him up, Mr. Putney advised that they were friends and that he had picked up Defendant at a gasoline station. Trooper Slusser considered this suspicious because he knew Defendant had arrived by bus. Mr. Putney described Defendant as

---

[6] While Trooper Slusser was in the cruiser with Mr. Putney, he received an email forwarding the email from Detective Sergeant Trudeau describing the DMV tip regarding the Putneys' alleged involvement in heroin. He does not recall if he read the email at the time, although he believes he did so.

someone he had met him in town "a while ago" and whom he had not seen recently. He stated that Defendant had family in Vermont. When Trooper Slusser asked why Defendant's family could not pick him up, Mr. Putney responded that he was not sure, but he "didn't think a lot of them drove."

In response to questions from Trooper Slusser, Mr. Putney advised that he "always just drop[s] [Defendant] off in Barre and he walks from there." When Trooper Slusser responded that that did not make sense, Mr. Putney provided a rambling explanation and admitted that he did not know how long Defendant was "staying here or anything." Trooper Slusser credibly testified that he found Mr. Putney's responses suspicious because he seemed to have little understanding of the purpose for which he had picked up Defendant and where he was taking him.

Mr. Putney discussed pulling up next to the guardrail and Trooper Slusser asked why it took Mr. Putney so long to pull over. Mr. Putney responded that he was looking for the safest spot and he could not slam on the brakes while he was going seventy miles an hour. He advised Trooper Slusser that he was not challenging the reason for the stop and tacitly conceded that he had been speeding. Mr. Putney then discussed an array of topics, including his work as a tow truck driver who tows vehicles at VSP's request. Trooper Slusser observed that Mr. Putney was excessively talkative regarding "safe" subjects and seemed to be implying that he worked for VSP.

At approximately twelve minutes after the initiation of the traffic stop, Trooper Slusser handed Mr. Putney a written warning for a speeding violation. He credibly testified that, at that point, he believed he had a reasonable suspicion of criminal activity. He asked for Mr. Putney's social security number to verify his identity. He also asked Mr. Putney if there was anything illegal in the vehicle to which Mr. Putney responded: "Nothing that I am aware of." The following colloquy ensued:

> **Trooper Slusser**: Would you have a problem with me searching the vehicle?
>
> **Francis Putney**: I don't have any problem with you searching my vehicle. I don't know. I mean you know but as far as him and you. I don't know what you have going on. I don't want to make anybody mad.

7

**Trooper Slusser**: You'd be okay with it though?

**Francis Putney**: Yeah, I mean it's okay with me if it's okay with you. Do you have any reason to?

**Trooper Slusser**: I'm going to let my dog run around it. Are you okay with that?

**Francis Putney**: I mean it's all up to you.

Trooper Slusser walked his canine around the pickup truck, and the canine alerted to the passenger door handle. This occurred approximately fifteen minutes after the initiation of the traffic stop. Trooper Slusser then put his canine back into his cruiser. After he did so, Mr. Putney remarked that he likes German Shepherds and tan colored dogs and began describing his favorite dog breeds. Trooper Slusser found this suspicious because his canine had just visibly alerted to Mr. Putney's vehicle. Trooper Slusser advised Mr. Putney that the canine had alerted and asked if people "smoked weed" in the vehicle. Mr. Putney indicated that they probably did when they borrowed it. When asked if he may have left a pipe or something like that in the pickup truck, Mr. Putney said he did not think he had "anything like that" but that he knew his brother sometimes smokes marijuana.

Trooper Slusser asked for written consent to search the vehicle, advising Mr. Putney that he could refuse consent in which event Trooper Slusser would seize the pickup truck and apply for a search warrant. He read a written consent card to Mr. Putney which contained this same information. Trooper Slusser instructed Mr. Putney to read the consent card to himself and sign in the location provided. Mr. Putney stated: "So if I don't sign it and tell you that you can't search it you're just going to get permission anyways" to which Trooper Slusser responded that he would have to seize the vehicle and apply for a search warrant from a judge. Trooper Slusser again asked Mr. Putney to sign the card if he agreed to it and asked if he had any questions. Mr. Putney told him he did not. He stated that if he did not sign the card, Trooper Slusser would take his truck. Trooper Slusser confirmed that he would seize the truck. Thereafter, Mr. Putney signed the card and handed it to Trooper Slusser. Trooper Slusser asked Mr. Putney if he would

8

be willing to exit the cruiser and stand next to the guardrail during the search. Mr. Putney agreed to do so.

Trooper Slusser approached the pickup truck and advised Defendant that he was going to search it. Defendant confirmed his identity and advised that he had arrived in West Lebanon by bus. Trooper Slusser asked Defendant to identify his possessions in the truck and Defendant indicated he had two bags—one at his feet and one in the back of the truck. Trooper Slusser advised Defendant that the canine alerted to the vehicle and that he wanted to search "everything in the vehicle and everybody." He advised Defendant that he did not have to allow the search and that, if he did not, Trooper Slusser would seize the vehicle and apply for a search warrant. Referring to Mr. Putney, Defendant responded: "Well, it's up to him." Trooper Slusser responded that he was talking to Defendant and that Defendant could refuse consent. Trooper Slusser asked Defendant: "Alright, are you good with that?" Defendant stated, "Yeah, I am good." After a pat down of Defendant's person during which Trooper Slusser retrieved a wallet and half of a marijuana cigarette, he asked Defendant to stand by the guardrail with Mr. Putney.

Trooper Slusser subsequently found 1,212 bags of heroin and 137 Percocet 30 milligram pills in one of Defendant's bags. At approximately twenty-eight minutes after the initial stop of the pickup truck, Trooper Slusser and Trooper Gould arrested Defendant and Mr. Putney and transported them from the scene in separate cruisers.

## II. Conclusions of Law and Analysis.

### A. Whether Trooper Slusser Unreasonably Prolonged the Traffic Stop.

In seeking suppression of the evidence against him, Defendant does not challenge the validity of the initial traffic stop. Instead, he argues that Trooper Slusser prolonged the stop such that it was unreasonable in scope and duration in violation of the Fourth Amendment.[7] He contends that the consent Trooper Slusser subsequently obtained from

---

[7] As a passenger in the vehicle, Defendant has standing to challenge the legality of the traffic stop. *See Brendlin v. California*, 551 U.S. 249, 251, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, *through means intentionally applied*," thus in a traffic stop "[the] passenger is

9

both Defendant and Mr. Putney to search the pickup truck was itself a product of the allegedly unlawful seizure and cannot independently justify the search. *See United States v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) (where "the consent itself was tainted by the Government's unlawful conduct, it [is] ineffective to justify the search.").

An otherwise lawful stop "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns[.]" *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). Tasks such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are within the scope of a traffic stop. *Id.* at 1615; *see also United States v. Long*, 320 F.3d 795, 799 (8th Cir. 2003) (ruling that "[a]n officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip."). Investigative measures "aimed at detect[ing] evidence of ordinary criminal wrongdoing" are outside the scope of a permissible traffic stop and cannot take place "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615 (internal quotation marks omitted).

In this case, Trooper Slusser undertook unrelated investigative measures that unquestionably lengthened the duration of the traffic stop beyond the time necessary to issue a written warning for Mr. Putney's excessive speed. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court explained that to render such further investigation lawful, the police officer "must be able to point to specific and articulable facts which, taken

---

seized as well and so may challenge the constitutionality of the stop") (internal quotation marks and citations omitted); *see also United States v. Chin*, 2013 WL 5406239, at *5 (D. Vt. Sept. 26, 2013) ("[A] passenger has standing to challenge the constitutionality of a stop of the vehicle in which he or she is traveling.").

10

together with rational inferences from those facts, reasonably warrant [an] intrusion [upon an individual's Fourth Amendment rights]." *Terry*, 392 U.S. at 21. "While [an] officer may not rely on an inchoate and unparticularized suspicion or hunch . . . he is entitled to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (internal quotation marks and citation omitted).

In deciding whether a further detention is reasonable, "courts consider (1) whether the officer's action was justified at its inception; and (2) 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *United States v. Foreste*, 780 F.3d 518, 526 (2d Cir. 2015) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "In the case of a suspected drug transaction . . . the reasonable suspicion inquiry must ask if 'the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer.'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citation omitted). The reasonableness of an officer's suspicions of criminal activity is determined from the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[law enforcement] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.").

It is undisputed that the traffic stop was justified at its inception by Mr. Putney's excessive speed. Thereafter, Trooper Slusser credibly testified that a number of objective facts made him suspicious that the pickup truck's occupants may be engaged in other criminal activity. He knew that the pickup truck was registered to Robert Putney, a suspected heroin trafficker, and operated by Francis Putney, also a suspected heroin trafficker. He also knew that the Putney brothers were suspected of obtaining heroin from the city and trafficking drugs out of their father's Graniteville garage. He knew that Mr. Putney had just picked up an unknown male at a bus station which was a point of

entry for drug couriers and that the VDTF was conducting surveillance at that location in anticipation of the arrival of a drug courier. He knew that Detective Sergeant Gardner had found the pickup truck sufficiently suspicious to cause him to follow it and direct Trooper Slusser to stop it if there was a lawful basis to do so. *See United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir. 1992) (concluding reasonable suspicion existed when suspect arrived "on a bus known to be favored by drug couriers" and thereafter "evasively attempted to leave via the bus parking lot rather than the terminal"); *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992) (noting that defendant's arrival by bus used by drug couriers from "source city" was a fact to be considered in determining whether reasonable suspicion existed) (internal quotation marks omitted); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

Despite Mr. Putney's initial excessive speed which commenced as soon as he left the bus station, Trooper Slusser observed that the pickup truck took a long time to pull over to the shoulder of the highway. Upon approaching the pickup truck and interacting with its occupants, Trooper Slusser observed that Mr. Putney exhibited extreme nervousness arguably unwarranted in a traffic stop for speeding. *See Wardlow*, 528 U.S. at 124 (observing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Charleus*, 871 F.2d 265, 269 (2d Cir. 1989) (remarking that, "[i]n determining whether there is reasonable suspicion, [courts] have weighed a number of factors, including excessive nervousness of the suspect").

Mr. Putney advised that he possessed neither his operator's license, nor any other form of identification. It was therefore reasonable for Trooper Slusser to ask him if he would exit the pickup truck and enter the police cruiser where his identity could be verified. *See United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) ("We have held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of his investigation of the circumstances that originally caused the stop.").

In patting down Mr. Putney before he entered the police cruiser, Trooper Slusser asked where he had come from and Mr. Putney indicated West Lebanon. He subsequently advised that he had picked up Defendant from a gasoline station. *See United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (concluding "questions" about "comings and goings" of suspect are reasonable); *Pack*, 612 F.3d at 350 (holding law enforcement officer "may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because [courts] consider these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop."). Mr. Putney's responses appeared designed to conceal the fact that he was en route from the White River Junction bus station and that Defendant had just gotten off the bus from New York.

In the police cruiser, Mr. Putney was eager to discuss "safe" subjects and to align himself with law enforcement as a tow truck driver who towed vehicles at VSP's request. He, however, expressed only a vague understanding of how he knew Defendant, why he was picking him up, and where he was taking him. Trooper Slusser credibly found his explanations nonsensical. *See United States v. Hooper*, 935 F.2d 484, 494 (2d Cir. 1991) (concluding that "confused and contradictory responses" to officers' questions combined with nervous demeanor and lack of identification gave rise to reasonable suspicion of drug activity); *United States v. Lopez*, 553 F. App'x 10, 12 (2d Cir. 2014) (holding that "shaking and breathing irregularly" and "difficulty answering questions about . . . travel plans" may give law enforcement a sufficient basis to reasonably suspect illegal activity); *see also United States v. Bowman*, 660 F.3d 338, 344 (8th Cir. 2011) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered.") (internal quotation marks omitted).

Although each individual fact in this case, viewed in isolation, would not be sufficient to give rise to a reasonable suspicion of criminal activity, the Supreme Court has cautioned against a piecemeal approach. *See Arvizu*, 534 U.S. at 274 (rejecting *Terry* analysis that evaluated "factors in isolation from each other" and whether each was

"readily susceptible to an innocent explanation" and concluding that *Terry* "precludes this sort of divide-and-conquer analysis"). Instead, the court must examine the totality of the circumstances, and determine whether an experienced police officer such as Trooper Slusser had a reasonable and articulable basis for believing criminal activity was afoot. *See United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) ("[I]n assessing reasonable suspicion, the court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene.") (internal quotation marks omitted).

"[T]he amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Padilla*, 548 F.3d at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Here, the totality of the circumstances satisfies the *Terry* standard. Trooper Slusser had a reasonable, articulable suspicion that Francis Putney was transporting a drug courier who had arrived by bus from New York City. It was therefore reasonable for Trooper Slusser to briefly prolong the traffic stop to ask Mr. Putney if he would consent to a canine sniff of the pickup truck to dispel or confirm Trooper Slusser's suspicion. *See Bailey*, 743 F.3d at 336 ("In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'"). After Mr. Putney voluntarily consented to the canine sniff and the canine alerted to the pickup truck, Trooper Slusser had probable cause to search it. *See Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013) (concluding a trained canine's alert can provide probable cause to search automobile).

Trooper Slusser subsequently obtained both Mr. Putney and Defendant's voluntary consent to a search of the pickup truck; that consent was untainted by any prior illegality. There is thus no basis for suppressing either the contraband lawfully seized as a result of that search, or the statements Francis Putney made to law enforcement after his arrest.

### B. Whether Trooper Slusser Was Permitted to Rely on the Collective Knowledge Doctrine.

Because the court has concluded that Trooper Slusser lawfully prolonged the traffic stop based upon a reasonable suspicion of criminal activity, the court need not consider whether the collective knowledge doctrine applies.[8] It is, however, beyond dispute that Detective Sergeant Gardner possessed ample additional facts supporting a reasonable suspicion of criminal activity. It also beyond dispute that when Detective Sergeant Gardner advised Trooper Slusser that a Putney had picked up an unknown person at a bus station that the VDTF was surveilling, Trooper Slusser was entitled to rely on not only that information but on the source of that information in analyzing the facts with which he was confronted. *See United States v. Nafzger*, 974 F.2d 906, 915-16 (7th Cir. 1992) (applying collective knowledge doctrine where arresting officer "knew that [other] officers who investigated the activities of [a] crime ring suspected the defendant was involved and that the crime was continuing").

### CONCLUSION

For the reasons stated above, the court DENIES Defendant's Motion to Suppress Physical Evidence and Statements (Doc. 29).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __14th__ day of December, 2015.

Christina Reiss, Chief Judge
United States District Court

---

[8] Pursuant to the collective knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). The underlying rationale is that, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (internal quotation marks omitted).

15